IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )  No. 10 CR 588-1
                           )
v.                         )  Magistrate Judge Jeffrey Cole
                           )
DAVID MESCHINO,            )
                           )
            Defendant.     )

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

The criminal complaint in this case charges that on July 9 and 10, 2010, David Meschino violated 18 U.S.C. §2161(A)(2) by making phone four telephone calls to "Victim A" with the intent to harass and to cause substantial emotional distress and that he engaged in a course of conduct that caused Victim A to suffer substantial emotional distress. Victim A was identified at a bond hearing on July 16, 2010, as Stacey Meschino, the defendant's niece. The phone calls came in the wake of Ms. Meschino's testimony at the sentencing hearing of her other uncle, Mario Meschino, who was charged in a case before Judge Kocoras with child pornography. At the hearing, Ms. Meschino related how her uncle had sexually abused her for ten years, beginning when she was 4 years old. Judge Kocoras credited her testimony, which resulted in certain enhancements and a 30-year sentence.

In the first call at 5:32 a.m., the defendant, David Meschino, is charged with having said:

Good morning Stacey. Ya fucking know who this voice is mother fucker? I want to know why you testified against my brother. If that is true, you are a low life, back

1

stabbing piece of shit. You better fucking call your uncle, Stacey. Tell me what the fuck you were saying in court and why? I hope to God it ain't true Stacey. I hope to God it ain't true. *See also* Govt. Ex 1,3.

The second call came nine minutes later:

> Hey you fat pimpled lesbian bitch. Thanks for helping put my brother in jail. Stacey go on with your life and leave me alone. ... Forget you and your fat ass, pimple face, back stabbing, two faced, feel sorry for me, kind of bitch. Fuck you Stacey forever. Fuck you![1] (*See also* Govt. Ex 1,3).

The third call came about 20 minutes later at 6:02 a.m. The affidavit in support of the complaint states that Mr. Meschino said:

> If you think you wanna fucking fuck with me you fucking cunt bag bitch, Come on over here right now. I hate you Stacey. Come on over right now, right now. You feel good about putting Mario in jail?... You little fucking tattletale. You had an orgasm, you enjoyed it. Fuck you, you bitch..

The call in its entirety, as revealed by the transcription of the telephone call and my independent review of the CD on which the calls were recorded, is as follows:

> Hey you know what Stacey? You're a piece of fucking shit. Ok? Now, I want to know who that other mother fucking family member is that you're fucking plotting against you fucking bitch. If you think you wanna fucking fuck with me you fucking cunt bag bitch, Come on over here right now. I hate you Stacey. Come on over right now, right now. You want to fuck peoples lives over? You wanna get revenge? Come on! Over here where I live. You know where I live Stacey. You got any problem with me? Come on over you fat bitch. Come on. You feel good about putting Mario in jail? You feel good (INAUDIBLE) about exaggerating the truth? You ever thank my parents for giving you a fucking home? You ever tell your dad you loved him? Huh?

---

[1] The message in its entirety was:

Hey you fat pimpled lesbian bitch. Thanks for helping put my brother in jail Stacey. Go on with your life and leave me alone. Forget the music forget you ever knew me. Forget you and your fat ass, pimple face, back stabbing, two faced, feel sorry for me, kind of bitch. Fuck you Stacey, forever. Fuck you!

> You're gonna go through a lot of stress Stacey. What you did is wrong. Blood is thicker than any God damn thing on the planet. You fuck, you miss out man. FBI this FBI that. You little fucking tattletale. You had an orgasm, you enjoyed it. Fuck you, you bitch! Come over here, come over here, who who is the other next family member you're plotting against? Come on Stacey, come on. Are you gonna feel good about revealing it? Come on. Let Jesus save you, Jesus save you, Jesus! (Govt. Ex. 1, 3).

The fourth telephone call came the next day on July 10, 2010, again in the early morning hours, at approximately 6:23 a.m.[2] The call, like the first three, was recorded on Ms. Meschino's voicemail. At this time, she had returned to Minnesota, where she currently lives. The first three calls were received by her voicemail while she was in Illinois preparing to return to Minnesota after testifying at the sentencing hearing of her uncle. The criminal complaint in this case charges that Mr. Meschino said:

> You are a liar in court. You tipped off the FBI. You got paid to do all this crap Stacey. You're a lying fool. I am going to get a civil lawsuit against you for lying in the court of law...You put my younger brother in jail for 30 years by tipping off the FBI...Stacey... I'm gonna hunt you down for the rest of my life. The minute I see you, OHHH, OHHH, the minute I see you, I'm gonna give you the biggest mother fucking hug that you can't stand... NO! I want the FBI to hear me, Carol.[3] I want Stacey to hear me...You like yourself Stacey? Do you like that you had a little orgasm yourself? You consensually agreed to do all this stuff. You were not forced. You were not beat up. You instantly went to my brother Mario. That was your thing. You got jealous!... And FBI motherfuckers come on over here my name is Dave Meschino... We're gonna be looking at you, we're gonna be investigating you. We're gonna get civil lawsuits against you Stacey. Okay? This is gonna be a long fucking ordeal.

Although not in the complaint, the complete conversation as revealed by the transcription of the conversation and the recording of the voicemail is even more disturbing, for Mr. Meschino makes

---

[2] It is unclear whether this is Michigan time, which is an hour ahead of Chicago, or whether it was local time, which would mean the call was placed at 5:30 Chicago time.

[3] Carol is Carol Wing, Stacey's aunt, with whom Mr. Meschino was living at the time.

3

specific reference to Judge Kocoras, whom he incorrectly describes as Judge "Kortron." Here is the call in its entirety:

> You know what Stacey? You are a liar in court. You tipped off the FBI. You got paid to do all this crap Stacey. You're a lying fool. I am going to get a civil lawsuit against you for lying in the court of law. You're going down my friend. You put my younger brother in jail for 30 years by tipping off the FBI by sensationalizing, by lying and by taking paid money. And you're a liar Stacey, you're a liar, let's say that again. $8,000.00 is that enough to fucking convict someone? Um yea. Is Judge Kortron [sic] ready to die from old age? Yea. Is Judge Kortron [sic] a fair Judge? Fuck no. He's a paid fucking, dick sucking, gay mother fucker that no one knows about. He's the Judge that convicts a fucking innocent man on circumstantial evidence. Yea, Stacey I'm gonna hunt you down for the rest of my life. The minute I see you, awwwwwww, awwwwwww the minute I see you I'm gonna give you the biggest mother fucking hug that you can't stand. He's in jail for 30 years because you lied. You lied Stacey, you lied, you lied, I'm going to a fucking federal government agent and I am gonna fucking, I'm gonna, I, I'm telling you Stacey you lied in court. (Background voice) NO! I want the FBI to hear me, Carol, I want Stacey to hear me. I want these fuckers to know they convicted an innocent fucking man. They fucking brought in rape charges in a fucking God damn pornography case. You feel good about yourself Stacey? Huh? You don't like guys? You gotta screw your own family member and lie in a court of law? You like yourself Stacey? Do you like that you had a little orgasm yourself? You consensually agreed to do all this stuff. You were not forced. You were not beat up. You instantly went to my brother Mario. That was your thing. You got jealous! You got a boyfriend and you wanted to back stab him. You're sick Stacey. You're sick. You do not have a pure heart man. And FBI motherfuckers come on over here my name is Dave Meschino. I feel sorry for you Stacey man you got no fucking life man. You got no life. You create all this drama to kill our entire family. Why don't you go back to your insane mental case Ma? We're gonna be looking at you, we're gonna be investigating you. We're gonna get civil lawsuits against you Stacey. OK? This is gonna be a long fucking ordeal. (Govt. Ex. 1, 2).

As disturbing as these calls appear in print, their sinister, menacing and terrifying quality can only be fully appreciated by listening to the actual voicemail recordings. This was not the isolated rant of a distressed and grieving brother, acting under the evanescent emotion of the moment. Quite the contrary. The first three calls came at least 12 hours after the sentencing and appear to have been

4

strategically placed by Mr. Meschino in the early morning hours, when his niece would likely be most vulnerable. Moreover, they appear to have been placed just far enough apart to have maximum impact, leaving enough time for her to compose herself before the next onslaught. Twenty-four hours passed before the final call. This was the longest and the most menacing call and the one in which Mr. Meschino also targeted Judge Kocoras as an object of his wrath. If Mr. Meschino had been acting under a kind of irresistible impulse in the aftermath of his brother's 30-year sentence there would not have been four calls over a two-day period. The number, the timing and the content of the calls reveal their premeditated quality, and more importantly the ineffable and inexhaustible loathing Mr. Meschino felt toward those whom he deemed responsible for the injustice he concluded had been done to his brother.

The government seeks detention. Mr. Walters, appointed counsel for the defendant, in his always-admirable and persuasive presentation, has suggested that Mr. Meschino be allowed to continue to reside with his aunt, Carol Wing, and his grandmother, who is 94 years old, and his girlfriend, who is employed during the day outside the home. The defendant would be under electronic monitoring. This recommendation accords with that of Pretrial. Neither side has filed a brief. The question is whether under the circumstances of this case there is a set of conditions that will reasonably assure the safety of the community and reasonably assure Mr. Meschino's attendance at trial.

## ANALYSIS

### A.

The Bail Reform Act's preference for liberty – a preference that is consistent with and demanded by our entire heritage – ensures that pretrial detention will occur only in the rarest of

circumstances. *Hamilton v. Lyons*, 74 F.3d 99, 105 (5th Cir. 1996). As the Supreme Court has stressed, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Thus 18 U.S.C. § 3142(a) and (b) provides that a person charged with an offense shall be released on personal recognizance or upon execution of an unsecured appearance bond unless further conditions are necessary to reasonably assure attendance at trial and the safety of the community. The preference for release accounts for § 3142(e)'s "require[ment that] the judge...consider the possibility of less restrictive alternatives to detention." *United States v. Infelise*, 934 F.2d 103, 105 (7th Cir. 1991)(Posner, J.). *See also United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985). Doubts regarding the propriety of release should be resolved in the defendant's favor. *United States v. Barnett*, 986 F.Supp. 385, 392 (W.D. La. 1997)(collecting cases).

Thus, merely because Mr. Meschino is charged with a serious crime involving witness harassment does not mean that, as a matter of law, bond cannot be granted. *Cf. Salerno*, 481 U.S. at 750. Indeed, there are any number of cases involving crimes of violence or drug trafficking where bond either has been granted or where the court made clear that bond was at least a theoretical possibility. *See Infelise*, 934 F.2d at 105; *United States v. Leonti*, 326 F.3d 1111, 1114 (9th Cir. 2003); *United States v. O'Dell*, 204 F.3d 829 (8th Cir. 2000); *United States v. Gigantei*, 39 F.3d 42, 48 (2nd Cir. 1994); *United States v. Mancuso*, 726 F.Supp. 1210, 1214 (D.Nev. 1989). In *United States v. Ploof*, 851 F.2d 7, 11-12 (1st Cir. 1988), the First Circuit stressed that even where there was serious risk of obstruction, intimidation, threat, or death to prospective witnesses, detention still requires showing that no set of conditions will "*reasonably* assure" safety. (Emphasis in original).

Decisions under the Bail Reform Act are discretionary. Discretion denotes the absence of a

hard and fast rule. *Langnes v. Green*, 282 U.S. 531, 541 (1931); *Rogers v. Loether*, 467 F.2d 1110, 1111-12 (7th Cir.1972) (Stevens, J.). Thus, on virtually identical facts, two decision makers can arrive at opposite conclusions, both of which constitute appropriate exercises of discretion. *United States. v. Banks*, 546 F.3d 507, 508 (7th Cir.2008). *Cf. United States v. Bullion*, 466 F.3d 574, 577 (7th Cir.2006) (Posner, J.)("The striking of a balance of uncertainties can rarely be deemed unreasonable....").

An exercise of discretion requires a consideration of the factors relevant to that exercise, *United States v. Roberson*, 474 F.3d 432, 436 (7th Cir. 2007); *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005), for discretion without a criterion for its exercise is authorization of arbitrariness. *Brown v. Allen*, 344 U.S. 443, 496 (1953)(Frankfurter, J., concurring and dissenting in part). *See also Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005). The factors that the Bail Reform Act requires be examined by the court in making its decision are: the nature of the circumstances of the charged offense, the weight of the evidence, the history and characteristics of the person, including whether at the time of the current offense the person was on other release pending trial under federal, state or local law, the person's family ties, length of residence in the community, appearance at court proceedings, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. §1342(g)(1)-(4).

**B.**

A review of these factors leads inexorably to the conclusion that granting bond in this case would be an abuse of discretion.[4] The crime with which Mr. Meschino is charged could scarcely be

---

[4] An abuse of discretion occurs when no reasonable person could agree with the court's conclusion. *See Rivera v. City of Chicago*, 469 F.3d 631 (7th Cir.2006).

7

more serious. And it is rendered perhaps even more repellant by the fact that the calls were made to a witness in a federal case as a consequence of her testimony. What Justice Jackson said in *N.L.R.B. v. Indiana & Michigan Electric Co.*, 318 U.S. 9, 29 (1943) applies with equal force to post-testimony "harass[ment]" designed to cause substantial emotional distress to a witness: "The influence of lawless force directed toward parties or witnesses to proceedings during their pendency is so sinister and undermining of the process of adjudication itself that no court should regard it with indifference or shelter it from exposure and inquiry." If witnesses cannot testify without fear of reprisal, the judicial system in this country will be imperiled and will cease to function in the way the Constitution envisions and demands. The consequences to the broader public interest would be pervasive and miasmatic.

  The weight of the evidence against Mr. Meschino is in direct proportion to the seriousness of the offense. It takes the form of the defendant's own statements made in four voicemail messages over a two-day period. To say they were vile and terrifying is an understatement. Mr. Meschino raged at Stacey Meschino, calling her a "backstabbing piece of shit," a "fat, pimpled, lesbian bitch," a "fat ass, pimple face, backstabbing, two faced, feel sorry for me kind of bitch," "a piece of fucking shit," a "fucking bitch," a "little fucking tattletale," a "liar," a "lying fool," and other loathsome epithets. Despite the fact that Judge Kocoras concluded that Ms. Meschino's testimony about having been sexually abused by her uncle for a ten-year period beginning when she was four years old was truthful, Mr. Meschino accused her more than ten times of lying. He told her that she was "sick," had no life, actually enjoyed the sexual relations she had with his brother/her uncle, had sought out that sexual relationship, and asked rhetorically what "other motherfucking family member is it that you're fucking plotting against, you fucking bitch?" He taunted her, demanding that she come over to his

8

house, with the not-too subtle threat of the awful consequences if she did.

Those statements are harassing, to say the least and were clearly designed to harm and to cause anguish. Indeed, measured by any objective standard, they could have done nothing else. While that is enough under §2161(A)(2), Mr. Meschino's statements went far beyond mere harassment. In determining whether words constitute a threat, Justice Holmes' famous admonition should be kept in mind: "We must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." Holmes, *Law In Science and Science In Law*, 12 Harv.L.Rev. 443, 460 (1889). Similarly, in determining whether words were intended to be threatening, one must look to context, for "[t]he message conveyed by a threat is determined by the context in which it occurs." *Adams v. Bertrand*, 453 F.3d 428, 433 (7th Cir. 2006). *See also Beverly California Corp. v. N.L.R.B.*, 227 F.3d 817, 837 (7th Cir. 2000). *Cf., Towne v. Eisner*, 245 U.S. 418, 425 (1918)( "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."); *In re Sawyer*, 360 U.S. 622, 653(1959)(Frankfurter, J., dissenting)("But the speech must be interpreted in its entirety, not distorted as an exercise in disjointed parsing. It must be placed in its context of time and circumstances.").

Thus, statements that in one context may be innocuous may be seen as a "veiled threat" in another, as Judge Posner observed in *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007): "If a male worker tells a female coworker that his male cat is raping his female cat, the remark could, in context, indicate a disregard for women's feelings (or even a veiled threat), rather than a disregard for female cats' feelings."(parenthesis in original). *See also Avila v. Pappas*, 591 F.3d 552, 553-54 (7th Cir. 2010)(statement that plaintiff could "go postal" coupled with advice to her friend "to duck,"

constituted an "implied threat"); *United States v. Johnson*, 497 F.3d 723, 726 (7th Cir. 2007)( the comment, "you're going to have to live with what you've done," could, in the context of its utterance, objectively be deemed a threat or intimidation); *United States v. De Stefano*, 476 F.2d 324, 327, 330 (7th Cir.1973)(statement to witness in an elevator, "Have you done any fishing lately?" constituted a threat under 18 U.S.C. § 1503).

Mr. Meschino did not leave solely to implication what he planned to do as a consequence of the testimony given by his niece. Subtlety was not his metier. He assured her she was "gonna go through a lot of stress," because "what you did is wrong." He told her: "you're going down my friend" for "put[ing] my younger brother in jail for 30 years by tipping off the FBI, by sensationalizing, by lying and by taking paid money." "I'm gonna hunt you down for the rest of my life. The minute I see you, awwwww, awwwwww, the minute I see you I'm gonna give you the biggest motherfucking hug that you can't stand." He said that "we're gonna be looking at you. We're gonna be investigating you. We're gonna get civil lawsuits against you, Stacey. This is gonna be a long, fucking ordeal." And all of this was interlaced with Mr. Meschino's vile and raging name-calling. Of course, Mr. Meschino's guilt or innocence are matters ultimately to be determined by the jury. *United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008). The point for present purposes is that on the present record the evidence against Mr. Meschino could scarcely be stronger. It overwhelmingly supports the conclusion that his statements were made to harass Stacey Meschino and to cause her substantial emotional distress and that measured by any objective standard, they had a reasonable tendency to achieve their desired goal.

Mr. Meschino's ties to the community are minimal. He has lived for the past year with relatives in Naperville. Prior to that, he lived in his car in California for a year and a half. No further

details of prior residency are known because his aunt, Carol Wing, with whom he lives either was unable or chose not to provide further details, and Mr. Meschino refused to do so. Even if he had greater ties to the community, that is but one factor in the calculus and does not inevitably tip the balance. *See, e.g., United States v. Price*, 2007 WL 2071695 (D.D.C. 2007).

Mr. Meschino also declined to provide any information to pretrial services about his girlfriend with whom he contends he has a current relationship, and more importantly, he declined to provide any information pertaining to alcohol use, illegal substance abuse or substance abuse treatment. He also declined to provide a voluntary urine sample for drug testing purposes. While I do not draw any negative inferences from Mr. Meschino's unwillingness to provide this information – information to which he has unique access – I am unable to make determinations favorable to him regarding various aspects of his character, which are factors that the Bail Reform Act requires I consider, if possible. Being responsible for this absence of information, Mr. Meschino has no basis for complaint. *Cf. R.H. Stearns Co. v. United States*, 291 U.S. 54, 61-62 (1934)(Cardozo, J.)(" 'He who prevents a thing from being done may not avail himself of the non-performance which he has himself occasioned, for the law says to him in effect "this is your own act, and therefore you are not damnified...." ").[5]

Mr. Meschino appears to have no source of income, and although he told pretrial services that he has been a self-employed musician for the past 25 years, earning between $50 and $250 a month, he said that he has no assets. He does, however, have outstanding loans and apparently a bank account in overdraft status. Family members are either unwilling or unable to post security in support

---

[5] *Compare, United States v. Goodwin*, 449 F.3d 766, 772 (7th Cir.2006)(Posner, J.)("He was therefore the co-author of the prolongation that is the fulcrum of his Fourth Amendment claim ... It is in that sense that he is the author of the delay of which he complains."); *United States v. Cohen*, 145 F.2d 82 (2nd Cir.1944) (L. Hand, J.); *cert. denied*, 323 U.S. 799 (1945) ("It is particularly unreasonable for the accused ... to complain of that confusion of which they were the authors.").

11

of a bond. The final, nonexclusive factor to be considered under the Bail Reform is the potential danger to any person or the community that would be posed by the person's release. That factor certainly does not favor Mr. Meschino, for the reasons discussed below.

## C.

While Pretrial Services has recommended release and has concluded that there are a set of conditions that will reasonably assure Mr. Meschino's attendance at trial and the safety of the community, I respectfully disagree. The Bail Reform Act does not – indeed, it could not – require the government to show with certainty that a particular defendant poses a risk of flight or danger to the community. It recognizes that bond decisions are inevitably exercises in uncertain prophesy. The Act is properly premised on the theory that there is nothing inherently unattainable about a prediction of future criminal conduct, and the fact-intensive assessment of all relevant factors and the various safeguards under the Act are specifically designed to further the accuracy of that determination. *Salerno*, 481 U.S. at 751.[6]

An examination of those factors as applied in this case simply does not support the conclusion either that Mr. Meschino is not a flight risk or that he is not a danger to the community – specifically to Ms. Meschino. And those factors support the conclusion that there is no set of conditions that will reasonably assure Mr. Meschino's attendance at trial or the safety of the community. In his mind, Ms. Meschino had taken money from the government to frame his brother, when in fact, she had sought out the sexual attentions of her uncle, rather than having been victimized by him, as she

---

[6] It is significant that even the defendant in *Salerno* who had contended that the Bail Reform Act impermissibly allowing detention based on predictions of future dangerousness, conceded that an arrestee may be incarcerated until trial if he presents a danger to witnesses (or a risk of flight). *Id.* at 749. So too did the Second Circuit, which had ruled in Salerno's favor.

claimed and as Judge Kocoras found. She had, he said, shamelessly lied and may well have been plotting against other family members. The result of all of her supposed treachery and betrayal was that Mr. Meschino's brother would be spending the next 30 years in jail, and the family would never recover. And now, she is responsible for Mr. Meschino's arrest and the current charges against him. As the government pointed out at the bond earing, the only reason the calls stopped – or that Mr. Meschino did not go farther than he did – was because of his arrest.

In assessing future danger to Stacey Meschino, I cannot ignore the venom and the intensity of feeling that seeps from every word uttered by Mr. Meschino on the voicemail recordings. Given Mr. Meschino's undisguised hatred for his niece and the uncontrollable emotions that led to his calls to her, I cannot reasonably conclude that he will refrain from further attempts to harass her, or worse, attempt some form of direct retaliation if bond should be granted. But there is more!

The uncontrollable rage expressed by Mr. Meschino found an additional object in Judge Kocoras. In the July 10 voicemail, in the midst of his tirade against Stacey, Mr. Meschino turned his attention to Judge Kocoras, whom he referred to as Judge Kortron:

> Is Judge Kortron [sic] ready to die from old age? Yea. Is Judge Kortron [sic] a fair Judge? Fuck no. He's a paid fucking, dick sucking, gay mother fucker that no one knows about. He's the Judge that convicts a fucking innocent man on circumstantial evidence. Yea, Stacey I'm gonna hunt you down for the rest of my life. The minute I see you, awwwwwww, awwwwwww the minute I see you I'm gonna give you the biggest mother fucking hug that you can't stand.

The tape makes clear not only that Mr. Meschino thought his brother was in jail for 30 years because Stacey lied, but also because of Judge Kocoras' unfairness. Of course, it is no surprise that a judge who is part of the dramatic episode that all sentencings in serious criminal cases are was deemed unfair or unfit by the defendant's family. And, Mr. Meschino was entitled to vehemently

criticize the judge in whatever unflattering, intemperate, and distasteful fashion he chose. *Cf., Craig v. Harney,* 331 U.S. 367, 376 1947); *In re Sawyer* 360 U.S. at 663 *In re Sawyer,* 360 U.S. 663 (Frankfurter, J., dissenting)(distinguishing between private conversations and public attacks on a judge by a lawyer actively involved in the case); *Barrett v. Harrington,* 130 F.3d 246, 262 (6th Cir.1997). He was even free to hope for the judge's demise through accelerated natural causes. But Mr. Meschino went farther when he ominously said: "Is Judge Kortron ready to die from old age? Yea."

Judge Kocoras is 72 years old. He is vital and vibrant. Mr. Meschino's comment could not then have meant that the judge was ready to die of natural causes or even that he was senile and didn't understand what was going on around him. The voicemail makes clear that Mr. Meschino thought the sentence was the product of venality, not senility. Moreover, Mr. Meschino's absolute unfamiliarity with Judge Kocoras --he did not even know his correct name – makes it unlikely that he was merely predicting death because of advanced years. And finally, the tone and inflection on the actual voicemail, which say even more than the words, themselves, reveal a meaning quite beyond a simple question and answer. n short, the available evidence and the context in which Mr. Meschino spoke support the conclusion that the reference was a veiled threat.

But even if it were not, the statement and the fury with which the words were uttered further underscore Mr. Meschino's inexhaustible hatred toward those whom he considered responsible for having put "an innocent man" in prison jail for 30 years. "Under a realistic appraisal of psychological tendencies and human weakness," *Withrow v. Larkin,* 421 U.S. 35, 47 (1975), I cannot conclude that Mr. Meschino would abide by the conditions of a bond and refrain from attempting to take some action either directly or indirectly against Stacey Meschino, even if I thought there was no threat to Judge Kocoras.

14

Bitter experience in cases involving harassment and threats that have gone unheeded teaches that the kind of behavior exhibited by Mr. Meschino should not be assumed to be empty fustian, which will abate if bond is issued. And while the consequences of mistakes in other cases are not decisive, they are not without some predictive capacity where like-behavior is involved. What Justice Cardozo said in another context is not without significance here: "Experience is...available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Sinclair Refining Co. v. Jenkins Pet. Proc. Co.*, 289 U.S. 689, 698 (1933). *Compare, United States v Montoya De Hernandez*, 473 U.S. 531, 542 (1985)("Our evaluation is guided by 'common sense and ordinary human experience.'").

Mr. Walters, appointed counsel for the defendant, has suggested that Mr. Meschino be allowed to continue to reside with his aunt, Carol Wing, and his 94 year old grandmother. That recommendation accords with Pretrial Service's.[7] This living arrangement, Mr. Walters contends, coupled with electronic monitoring and home confinement, will suffice to ensure the safety of the community. Again, I respectfully cannot agree. These are the same people with whom Mr. Meschino was living when he made his four calls to Stacey Meschino; their presence was not enough to dissuade him from making the calls in the first place. We know nothing about the girlfriend, who will also be living there but will not be a custodian. It is doubtful that his 94 year old grandmother could fulfill the demands of a custodian under the singular circumstances of this case. Moreover, Pretrial Services'

---

[7] Ms. Wing has said that she cannot act as custodian. Given Ms. Wing's presence when the fourth call was made to Stacey Meschino and her inability to control his behavior (as revealed by Mr. Meschino's own words on the voicemail) and the favorable bias towards Mr. Meschino's brother and her hostile reaction to Stacey at his sentencing, she could not act as a custodian even if she were willing to do so. When Stacey completed her testimony before Judge Kocoras, Ms. Wing said to her in the courtroom that she couldn't believe that she would have testified like that against her uncle, and that "this is going to kill your grandma." (Govt. Ex. 4).

15

July 16, 2010 addendum (at 2:02 p.m.) to its initial report states that during a conversation with the defendant's grandmother, she "was unable to verify her exact address." She could only give the city and street name and she was not aware of the pending charges against her grandson.

In sum, the government has shown by clear and convincing evidence that there is no set of conditions that will reasonably assure the safety of the community, and it has shown by a preponderance of the evidence that no set of conditions will reasonably assure Mr. Meschino's attendance at trial.[8] Accordingly, the defendant's oral motion for bond is denied, and the government's oral motion for detention is granted. The defendant is committed to the custody of the U.S. Marshals until further order of court.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 7/19/10

---

[8] The Bail Reform Act prescribes different burdens of proof depending on whether the question involves the efficacy of conditions to assure attendance at trial or the safety of the community. If the former, the standard is a preponderance of the evidence; if the latter, it is proof by clear and convincing evidence. 18 U.S.C. 3142(f)(2)(B). The burden of proof by clear and convincing evidence is a greater burden of proof than preponderance of the evidence. *Maynard v. Nygren*, 332 F.3d 462, 469 (7th Cir.2003). Clear and convincing evidence is evidence that places "in the ultimate fact-finder an abiding conviction that the truth of ... [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). See also *United States v. Boos*, 329 F.3d 907, 911 (7th Cir.2003).